RITTMASTER, APPELLANT, v. BRISBANE, APPELLEE.

1. DETERMINATION OF ISSUE BY APPELLATE COURT.
Where an issue of fact is tried at *nisi prius* upon evidence taken and reported in writing, the appellate court will sift and weigh the evidence with the view to a just determination of the issue uninfluenced by the finding of the trial court.

2. BURDEN OF PROOF.
In an action to recover real property the burden of proof is upon the plaintiff to establish the title which he asserts by a preponderance of the evidence.

3. DELIVERY AND ACCEPTANCE OF DEED.
A deed must be delivered before it becomes operative as a conveyance, and, in general, acceptance is essential to complete the delivery and pass the title ; as to persons *sui juris* acceptance as well as delivery is a matter of intention to be proved by some act or declaration, or to be presumed from circumstances, but will not be lightly presumed where the grant imposes some burden or obligation upon the grantee, and the recording of a deed by the grantor without the direction or knowledge of the grantee is not itself evidence of acceptance.

*Appeal from the District Court of Lake County.*

ACTION for the recovery of real property and damages for its detention. Judgment in favor of plaintiff for possession and $2,700 damages. Defendant appeals.

RICHNER-VAN NATTA DEED REFERRED TO IN OPINION:

" This deed, Made this twenty-first day of October, in the year of our Lord one thousand eight hundred and seventy-nine, between Herman Richner, of the County of Lake and State of Colorado, of the first part, and N. T. Van Natta, of the County of Republic, and State of Kansas, of the second part,

" Witnesseth, That the said party of the first part, for and in consideration of the sum of one hundred dollars ($100) to the said party of the first part in hand paid by the said party of the second part, the receipt whereof is hereby confessed and acknowledged, has remised, released, sold, conveyed and quit-claimed, and by these presence does remise, sell, convey and quit-claim unto the said party of the second part, his heirs and assigns forever, all the right, title, interest, claim and demand which the said party of the first part *has* in and to the following described real estate, situate, lying and being in the County of Lake and State of Colorado, to-wit:

" Lots numbered six (6) in block five (5), and lot five (5) in block three (3), in the city of Leadville, Leadville Improvement Company's addition.

" It is hereby expressly covenanted and agreed that the grantee herein shall pay to William H. Bush, of Leadville, Colorado, the balance of the purchase money due on said property.

" To have and to hold the same, together with all and singular the appurtenances and privileges thereunto belonging, or in any wise thereunto appertaining, and all the estate, right, title, interest and claim whatsoever of the said party of the first part, either in law or equity, to the only proper use, benefit and behoof of the said party of the second part, his heirs and assigns forever.

" In witness whereof the said party of the first part has

hereunto set his hand and seal the day and year first above
written.         (Signed)     HERMAN RICHNER.     [SEAL]"

Mr. ALVIN MARSH, for appellant.

Messrs. BLAKE & SAYRE, for appellee.

MR. JUSTICE ELLIOTT delivered the opinion of the court.

This action as instituted would have been called *ejectment*
under our former practice.   Brisbane, plaintiff below, by his
complaint claimed to be the owner in fee of lot 5 in block 3
in the Leadville Improvement Company's addition to the
city of Leadville, in Lake county, Colorado.

Rittmaster, defendant below, by his answer claimed title
in fee to the west 100 feet of said lot 5, but disclaimed hav-
ing any interest in the residue.   Both parties claimed the
premises by mesne conveyances from William H. Bush as
the common source of title.

It appears that Bush, as owner of the property, on July 22,
1879, executed a warranty deed conveying the west 100 feet
of said lot 5 to one Herman Richner.   The deed was not de-
livered at that time, but was deposited as an escrow with the
Miners' Exchange Bank in Leadville to be delivered to Rich-
ner upon his paying the purchase money.   The consideration
stated in the deed was $1,300.

On October 21, 1879, before Richner had finished paying
for the property—before he had entered into possession there-
of—and while the deed from Bush to him was still held as
an escrow by the bank, Richner executed, and on the same
day caused to be recorded in the recorder's office of Lake
county, a quitclaim deed of the property in controversy (in-
cluding other property) to one N. T. Van Natta of Kansas.

On May 14, 1887, one C. C. Joy, as the agent of W. H.
Bush, visited Van Natta in Kansas, and obtained from him
a quitclaim deed of the premises to Bush; this deed was
recorded May 31, 1887.

On June 4, 1887, Bush gave a quitclaim deed of the premises to the plaintiff Brisbane; this deed was recorded June 7, 1887.

Such is the chain of title under which appellee Brisbane claims in this action.

The chain of title upon which appellant Rittmaster relies is as follows:

While the deed from Bush to Richner was held by the bank as an escrow, Richner having made certain payments on account of the property, was permitted to take possession of the same in November, 1879.

On February 24, 1880, Richner finished paying for the property, and received the deed previously held as an escrow; he thereupon executed and delivered a warranty deed of the property to Alexander Rittmaster (appellant) and Levi and Abram Rachofsky, and thereupon the grantees under the latter deed went into possession of the property. Both of these deeds were recorded March 8, 1880.

On June 1, 1886, the Rachofskys gave a quitclaim deed of the premises to appellant, which deed was recorded June 5, 1886.

From the foregoing it is clear that to entitle Brisbane to recover, two questions must be resolved in his favor—that is, in the affirmative: *First*, Was the deed of October 21, 1879, from Richner to Van Natta actually delivered by Richner and accepted by Van Natta before Rittmaster and the Rachofskys acquired their deed to the premises? *Second*, If the Richner-Van Natta deed was thus delivered and accepted, was it effectual to convey to Van Natta the fee simple title afterwards acquired by Richner?

In respect to the second question, it will be observed that the deed is a mere quitclaim and release; it does not purport to convey "an estate in fee simple absolute;" nor does it purport to convey the land at all, but merely the right, title or interest which Richner *had* in the premises at the time of its execution. Counsel concede that section 4 of the statute of conveyances (Gen. Stats. § 201; Mills' An. Stats. § 430)

" has no application except in cases where the deed purports to convey an estate in fee simple absolute." But they contend that as Richner had some right and title to the premises when he executed the deed to Van Natta, his deed, if delivered and accepted in time, was effectual to convey such right and title as he then had, and that when he subsequently acquired the legal title it immediately inured to the benefit of Van Natta by virtue of the delivery and acceptance of the deed of October 21, 1879, to the exclusion of the intermediate purchasers. It is also urged that in determining the effect of the deed the following provision must be considered:

" It is hereby expressly covenanted and agreed that the grantee herein shall pay to William H. Bush, of Leadville, Colorado, the balance of the purchase money due on said property."

It may be conceded that a voluntary acceptance of the deed by Van Natta would, by reason of such covenant, have rendered him liable for the balance of the unpaid purchase money. But the covenant is a mere personal covenant; it is not a covenant running with the land; it is not a covenant of *seisin*, nor for quiet and peaceable possession, nor of general or special warranty.

Counsel for appellee have presented an elaborate brief based upon common law authorities in support of their views. But we need not now determine the questions of law thus presented, since they depend upon questions of fact to be determined from a consideration of the evidence as disclosed by the record. Did Richner deliver his deed of October, 1879, to Van Natta, and did Van Natta accept the same ?

1. This cause was tried by the court without a jury, and it is urged that, as delivery and acceptance are questions of fact, the appellate court should consider itself bound by the findings of the trial court. The general rule undoubtedly is, that the appellate court will not disturb the findings of the trial court upon an issue of fact where the court tries the issue upon evidence given orally by living witnesses in its presence, *provided* there is a substantial conflict in the

evidence bearing upon such issue. But when the issue is determined upon testimony taken and reported to the trial court in writing, the rule is different. In such case, as was said by Chief Justice Thatcher in *Jackson v. Allen*, 4 Colo. 268, the "appellate court will not sustain the decree of the court below, merely on the ground that it is not unsupported by evidence; but will examine the entire record, sift all the evidence adduced with the view of arriving at the truth." The reasons for this distinction have been so often pointed out that they need not be repeated. *Miller v. Taylor*, 6 Colo. 41; *Sieber v. Frink*, 7 Colo. 148; *Stockgrowers' Bank v. Newton*, 13 Colo. 250; *Kimball v. Lyon, ante*, 266.

At the second trial of this cause in April, 1890 (the trial now under review), all the direct testimony bearing upon the question of Van Natta's alleged acceptance of the Richner deed was the testimony of Richner and Van Natta themselves, and perhaps the testimony of William H. Bush. None of these witnesses gave their testimony orally before the court on that trial. The testimony of Richner was read from the stenographic notes of his testimony as given on the first trial, February, 1888; his deposition taken in January, 1890, was also read. The testimony of Van Natta consisted of two depositions,—one taken in January, 1888, and the other taken in May, 1889. The testimony of Bush was read from his deposition. More than two years elapsed between the two trials. The testimony of Richner on the second trial, read from the stenographic notes, must on this review be considered the same in effect as if taken by deposition.

2. From the foregoing it follows that upon this appeal this court must sift and weigh the evidence bearing upon the question of the alleged delivery and acceptance of the Richner-Van Natta deed with the view to a just determination of the controversy uninfluenced by the finding of the trial court; not only the direct evidence, but all the facts and circumstances throwing light upon such question, must be thus considered; and in arriving at a conclusion it is to be borne in mind that the burden of proof is upon appellee

(plaintiff below) to establish such delivery and acceptance by a preponderance of the evidence.

It must be admitted that there is some inconsistency between Richner's testimony, as first given, and his deposition afterwards taken. The same is true of the two depositions of Van Natta. The testimony of Richner as given in 1888 indicates that within a week after executing and recording the quitclaim deed of October, 1879, he wrote to Van Natta about the deed and sent the same to him. But in his deposition, taken in 1890, he states that in testifying at the first trial about sending the deed to Van Natta, he referred to his correspondence with Van Natta in the fall of 1886, when he wrote and asked Van Natta to re-deed the property—that is, to deed it back to Richner.

The explanation of Richner upon this point is corroborated by Van Natta by his first deposition as well as by his second. The following is from the first deposition of Van Natta:

" *Q.* 4. Did you know of the execution of a deed by Herman Richner to you of lot No. 6 in block No. 5 and lot No. 5 in block No. 3 of the Leadville Improvement Company addition to the city of Leadville and dated October 21st, 1879, and if so when did said deed come into your possession and from whom did you receive it?

" *A.* There was a deed from Herman Richner to me of the lots in Leadville mentioned in the above question, but the date of the deed and date of reception and from whom received I cannot say, but subsequent transactions show that such deed was made October 21st, 1879, conveying to me the lots mentioned in the question No. 4. *The transaction referred to* was the reception of a deed and letters from Herman Richner or his agent or from both, asking me to sign and return. The written portion of the deed contained, as it struck me, such strange and extraordinary explanations (and being no part of the conveyance) that I did not consider it, and there being no consideration offered or accompanying it, I refused to make such deed."

The following is from the second deposition of Van Natta:

" *Q.* 3. Have you heard of a deed, made by Herman Richner to you, of lot No. 6 in Block No. 5 and lot No. 5 in Block No. 3 of the Leadville Improvement Company's Addition to the city of Leadville, which deed contained a condition that the grantee shall pay the purchase money ?   If yea, did you ever see the deed ?

" *A.* Yes, I have heard of it in this way.   Several years (it now seems to me) after the alleged making of deeds from Richner to myself, Richner or his attorney or both wrote to me and requested me to sign and return a deed to the lots it was alleged he had conveyed to me.   *On the reception of this deed for my signature, with letter of request to sign and return, I did not then believe, nor do I now believe that the deed from Richner conveying these lots was ever seen or received by me, or any one for me.   I had not, at the time of the reception of the letter and deed to convey, the faintest impression that I ever received a deed from Richner for these lots or any property in Leadville.*   The deed sent me for signing contained matters foreign to a conveyance of which I knew nothing.   This letter and deed to convey said lots, as I have above stated, was the first intimation or knowledge I had, either directly or indirectly, that Richner had conveyed them to me.   After the request of Richner or his attorney or both to sign and return the deed I paid no more attention to the lots in question than if they had had no existence, until C. C. Joy came to my home on the farm.   I did not then know, nor do I now know, anything of the condition therein referred to that the grantee should pay the purchase money."

The first testimony of Van Natta is somewhat vague and uncertain—perhaps evasive ; some portions of it may be construed as indicating that he knew of the existence of the deed from Richner and considered that he had acquired title to the property by means of it; that Richner was indebted to him for professional services, and that he considered the deed from Richner as part payment.   It is sometimes very easy for a man to *consider* that he has some right or title to prop-

erty, when he is offered $100 for it, and asked to give only a quitclaim deed.

The following shows the style of Van Natta's testimony in his first deposition:

" *Q*. 8. Was it not understood between you and Herman Richner prior to the execution of said deed that he was to execute the same to you?

" *A*. Why of course it was understood between Richner and myself that he was to pay what he owed me, and I was satisfied to receive it in such way as he could pay."

It is evident that this was not, and probably was not intended to be, a direct answer to the question. Van Natta's second deposition is quite different; therein he testified positively that the deed from Richner to him *was never in his possession*, and that he had *never received or in any manner accepted said deed*. He also further testified:

" *Q*. 6. Was there ever any contract, agreement or understanding between you and said Richner that he would convey said lots to you, prior to his so doing, or any agreement between you and him concerning said lots after the date of said deed until the said Richner was in Belleville in 1887, the time you deeded the lots to Richner?

" *A*. *There was no contract, agreement or understanding between said Richner, or any one for him, and myself that he would or was to convey the said lots to me, neither before nor after it is said that said lots were conveyed to me.*"

" *Q*. 9. State whether or not you would have accepted this deed if you had seen it, or known that by the terms of the deed you would have become liable to pay the purchase money that Richner was to pay, and whether you ever did accept such deed?

" *A*. *Again I say I do not now remember, nor can I now recall, nor have I ever been able so to recall or remember, the slightest impression that I ever then, or at any subsequent time, received from Richner the deed conveying said lots to me, and when he wrote me and asked me to reconvey, I believed then, and do now, that he was mistaken when he said that he had*

*made the deed and sent it to me,* and of course I could not accept a thing that, to me, had no existence, *and had I at that time received the deed with the condition of paying the balance of the purchase money as therein named, I never would have accepted such deed had one been tendered to me under any circumstances.*"

When there is conflict between the testimony of different witnesses, and especially when the same witness makes inconsistent statements, it often becomes necessary to consider the undisputed facts and circumstances connected with the matters to which the conflicting and inconsistent statements relate in order to arrive at the truth ; and this is the more necessary when the tribunal charged with the responsibility of weighing the evidence and determining the issues does not see or hear the living witnesses.    The accuracy and value of a witness' testimony may often be determined by comparing his statements with known facts and circumstances pertaining to the matter or transaction under investigation.

Truth is consistent ; error is inconsistent.    The real facts and circumstances of every transaction will always be found consistent with each other when the whole truth is known. As expressed by an eminent author, " All facts and circumstances which have really happened were perfectly consistent with each other, for they did actually so consist."    (Starkie's Ev. \*842.)    Truth appears clearer the more it is examined in the light of its surroundings ; truth courts the fullest investigation.    Error shrinks from investigation, because its surroundings reveal its inconsistencies.    The untruthful witness seeks refuge in the obscurity of general assertions ; he avoids the statement of particulars.

What are the undisputed facts and circumstances pertaining to this transaction ?    The more important are as follows :

In 1879, Richner entered into a contract with Bush for the purchase of the property in controversy, the deed therefor being held as an escrow by a third party until the purchase money should be paid.    Before Richner acquired the legal title to the property,—before he paid for or took possession

of the same,—he executed and recorded the quitclaim deed of the property to Van Natta. This deed was executed and recorded without any negotiation, contract, agreement or understanding whatever in respect to the matter between Richner and Van Natta. No consideration was paid or agreed to be paid for the property by Van Natta at the time the deed was executed or afterwards.

Thus far there is no dispute, though Van Natta testifies that Richner owed him about $200 when the deed was executed. Richner denies owing Van Natta anything at that time, and says he executed the deed because a man in Kansas was asserting a claim against him. In respect to this conflict it is sufficient to say that there is no evidence of any agreement between Richner and Van Natta that this deed was delivered or accepted, or was to be delivered or accepted, on account of the supposed indebtedness of Richner to Van Natta.

Again, the undisputed facts are that, about a month after executing the quitclaim deed to Van Natta, Richner took possession of the property, and in February, 1880, sold and conveyed the same by warranty deed to appellant Rittmaster and the Rachofskys, they having no actual knowledge of the deed to Van Natta. They paid the sum of $5,000 cash for the property, part of which sum was paid to Bush, as the balance of the purchase money, and the residue to Richner. The escrow deed from Bush to Richner, and also the deed from Richner to Rittmaster and the Rachofskys, were thereupon delivered, accepted, and recorded, and the latter parties went into possession of the property. They held the property more than seven years before any claim to the premises was asserted under the Richner-Van Natta quitclaim deed. During that time Rittmaster and the Rachofskys occupied the property, kept it in repair, redeemed it from the taxes of 1880, and paid the taxes on it for the years 1881, 1882, 1883, 1884, and 1885.

What did Van Natta do during all this time? He neither paid nor offered to pay the balance of the purchase money to

Bush, though the quitclaim deed contained an express covenant that he should pay the same, and it is conceded that by an unqualified acceptance of the deed he would have become obligated to make such payment. Van Natta neither paid nor offered to pay any taxes upon the property at any time; he never collected or attempted to collect any rents therefrom; he never asserted any title or claim to the property, never inquired after it, and did not visit Leadville during all of said time. He has never produced the quitclaim deed, nor any letter from Richner advising him about the property. Not until May, 1887, when he was visited by Joy, did he give the quitclaim deed of the property to Bush. It is admitted that Joy paid Van Natta the sum of $100 only for the quitclaim deed, and that this deed was procured to strengthen a claim to the property which Joy was attempting to maintain based upon a tax title. The tax title suit was afterwards determined in the United States circuit court at Denver in favor of Rittmaster.

Bush testified that he procured the deed from Van Natta for the purpose of perfecting the title of Joy. The following is from the deposition of Bush:

" Q. What if any consideration was paid by you to Van Natta for the deed referred to, and what consideration, if any, was paid by Brisbane to you for said lots?

" A. There was no consideration from me to Van Natta; I made the deed to Brisbane at the request of C. C. Joy, to whom I was under many obligations for work done."

There is no other evidence relating to the interest of appellee in the property. The equitable cross complaint of Rittmaster alleges that the deed from Bush to Brisbane was without consideration. Appellee's reply alleges that his deed from Bush was " based upon and supported by a valuable consideration;" but the amount of the consideration is not named as good equity pleading requires; the reply was not verified; besides, appellee did not testify in the case; and no proof was offered in support of his averment that there was a valuable consideration for the deed. Under the circum-

stances, the conclusion must be that the consideration was no more than nominal.

3. A deed must be delivered before it becomes operative as a conveyance, and, in general, acceptance is essential to complete the delivery and pass the title. In respect to persons *sui juris*, acceptance as well as delivery is a matter of intention. Intention may be manifested by some act or declaration, or it may be presumed from circumstances, but will not be lightly presumed where the grant imposes a burden or obligation upon the grantee, and the recording of a deed by the grantor without the direction or knowledge of the grantee is not of itself to be regarded as evidence of acceptance.

Van Natta, as he testifies, was a practicing attorney when the transaction under consideration occurred; he must be presumed to have been conversant with the law. Actions speak louder than words—so sometimes does inaction; and silence is often stronger than speech. In 1879 when Richner executed the quitclaim deed to Van Natta, and in 1880 when he executed the warranty deed to Rittmaster and the Rachofskys, Leadville was a prosperous, growing mining town; its reputation as such was wide-spread; there was a rapid rise in the price of real estate during that period; it appears that the property in controversy which was bought in July, 1879, for $1,300, was sold in February, 1880, for $5,000. If Van Natta received a deed to this Leadville property in October or November, 1879,—if he accepted or intended to accept such deed,—why did he not do something to manifest his acceptance? It is impossible to believe that he would have done nothing in respect to the property during the succeeding seven years and more, if he considered he had acquired a good title to it. Even his execution of the quitclaim deed to Bush, at the instance of Joy, for the sum of $100, indicates the relinquishment of mere color of title,—the removal of a cloud from title—rather than the conveyance of any real title; it does not indicate that he had previously received or accepted the Richner deed. Indeed, Van Natta's whole conduct as well as his positive testimony indicates that he never

received nor heard of the deed purporting to convey to him Richner's interest in the property for years and years after the same was executed and recorded.

Upon a careful review of the whole record our finding must be that the issue on the part of appellee is not sustained by a preponderance of the evidence ; on the contrary, our conclusion from the whole evidence and circumstances of the case is, that the quitclaim deed executed by Richner to Van Natta was never delivered and accepted; it is probable that Richner never intended to deliver it, and that he recorded it simply as a blind to his creditors ; but even if it was sent by Richner, we are satisfied that it was never received and never accepted by Van Natta.   This conclusion is as well sustained by the direct testimony as the opposite theory; it accords with the undisputed facts and circumstances of the case; it is consistent with common experience and in harmony with the motives which ordinarily influence and control human conduct.   Moreover, this conclusion protects those who pur· chased the property in good faith for a large consideration and who have occupied and improved the same and paid the taxes thereon for years and years ; it upholds the title of *bona fide* purchasers against a claim founded upon little or no consideration, and asserted by those who have done little or nothing in respect to the property.   In short, the conclusion subserves the ends of justice and equity and prevents wrong and injury.

The judgment of the district court is reversed, and the cause remanded with directions to render judgment in favor of defendant.

*Reversed.*

MR. JUSTICE GODDARD did not participate in the determination of this case.