**SPORTSMEN'S WILDLIFE DEFENSE FUND, a non-profit corporation; Western Slope Environmental Resource Council, a non-profit citizens group; Theresa Hamilton, an individual; Richard Saxton, an individual; and David Huerkamp, an individual, Plaintiffs,**

**v.**

**UNITED STATES DEPARTMENT OF THE INTERIOR; Bruce Babbitt, in his official capacity as Secretary of the Department of the Interior; United States Fish and Wildlife Service; Mollie Beattie, in her official capacity as Director**

---

of the United States Fish and Wildlife Service; John Mumma, in his official capacity as Director of the Colorado Division of Wildlife; Laurie Mathews, in her official capacity as Director of the Colorado Division of Parks and Outdoor Recreation; Ari Zavaras, in his official capacity as Director of the Colorado Department of Corrections; and Roy Romer, in his official capacity as the Governor of the State of Colorado, Defendants.

Civil No. 96–B–1637.

United States District Court, D. Colorado.

Dec. 26, 1996.

Colin Deihl, Earthlaw, University of Denver School of Law, Denver, CO, for Plaintiffs.

Maurice G. Knazier, Attorney General's Office, John A. Lizza, First Asst. Attorney General, Timothy J. Monahan, Steven O. Sims, Assistant Attorney Generals, Natural Resources Section, Bob Clark, Assistant U.S. Attorney, Denver, CO, Thomas R. Graf, U.S. Dept. of the Interior, Lakewood, CO, for Defendants.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

This is an action asserting claims for violations under 42 U.S.C. § 1983 of the Pittman–Robertson Wildlife Restoration Act (P–R Act); 16 U.S.C. § 669 et seq., the Land and Water Conservation Fund Act (LWCF Act); 16 U.S.C. § 460l et seq., and the National Environmental Protection Act (NEPA); 42 U.S.C. § 4321 et seq. Jurisdiction is based on 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 1361. Plaintiffs, Sportsmen's Wildlife Defense Fund (SWDF), Western Slope Environmental Resource Council (WSERC), Theresa Hamilton (Hamilton), Richard Saxton (Saxton), and David Huerkamp (Huerkamp) (collectively, plaintiffs) move, pursuant to Fed.R.Civ.P. 65, for a preliminary injunction against state defendants John Mumma (Mumma), in his official capacity as Director of the Colorado Division of Wildlife (DOW), Laurie Mathews (Mathews), in her official capacity as Director of the Colorado Division of Parks and Outdoor Recreation (DOP), Ari Zavaras, in his official capacity as Director of the Colorado Department of Corrections (DOC), and Roy Romer (the Governor), in his official capacity as the Governor of the State of Colorado (State) (collectively, state defendants). Plaintiffs seek to enjoin prospectively the state defendants from any further construction of a prison within the boundaries of the West Rifle Creek State Wildlife Area (Wildlife Area) or the Rifle Gap State Park (State Park). After consideration of the motions, briefs, evidence taken at the preliminary injunction hearing, and arguments of counsel, I will deny the motion for preliminary injunction.

Also before me is the state defendants' motion to dismiss claim one (§ 1983 under the P–R Act) and claim two (§ 1983 under the LWCF Act) pursuant to 1) Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction and lack of standing and 2) Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. The motions addressed here do not involve plaintiffs' additional claims in mandamus against federal and state officials, allegations of violations of

NEPA, state based mandamus claims against the state defendants, and breach of fiduciary claims against the state defendants.

I deny the motion to dismiss based on lack of subject matter jurisdiction and lack of standing. I deny the motion to dismiss for failure to state a claim as to claim one, but grant it as to claim two.

## I.

### Background

This action was filed by plaintiffs to stop construction of an expansion of the DOC prison facility located in Rifle, Colorado (Rifle prison). The initial DOC Rifle facility, built in the mid 1960's, was known as the Rifle honor camp and consisted of a temporary or mobile facility which housed a dozen inmates. The honor camp capacity increased to 18 inmates in 1973, and to 60 inmates in 1975. During this time, the inmates continued to be housed in mobile trailers. In the late 1970's, the DOC constructed a permanent facility at Rifle with a capacity of 100 inmates. In 1983, an additional living unit was added raising the inmate population to 120. The last living unit was added in 1984 bringing the current inmate population to 150.

In 1996, the DOC began construction on an expansion of the Rifle prison which, if completed, will increase the prison population by 42 inmates for a total capacity of 192. Plaintiffs seek injunctive relief pursuant to Rule 65 to stop further construction at the Rifle prison pending the outcome of this action.

## II.

### The state defendants' motion to dismiss

The state defendants move to dismiss claims one and two of the second amended complaint based on Fed.R.Civ.P. 12(b)(1) for lack of jurisdiction and lack of standing. They also move to dismiss claims one and two pursuant to Fed.R.Civ.P. (12)(b)(6) for failure to state a claim upon which relief can be granted. At the outset, I address the motion to dismiss in light of its effect on the motion for preliminary injunction.

### A. *Fed.R.Civ.P. 12(b)(1)*

Pursuant to a Fed.R.Civ.P. 12(b)(1) motion to dismiss, a district court must consider whether it lacks subject matter jurisdiction. The burden of establishing subject matter jurisdiction is on the party asserting jurisdiction. *Basso v. Utah Power and Light Co.*, 495 F.2d 906, 909 (10th Cir.1974). In analyzing a Rule 12(b)(1) motion, the district court has wide discretion to consider affidavits, documents, and even hold a limited evidentiary hearing. *See Wheeler v. Hurdman*, 825 F.2d 257, 259 n. 5 (10th Cir.1987).

### 1. *Claims against Governor Roy Romer*

The Governor argues that under the circumstances, this Court does not have jurisdiction over him. I disagree.

The Governor's motion to dismiss was heard as part of the preliminary injunction. Therefore, I may consider documents and evidence admitted during the hearing. *See Wheeler*, 825 F.2d at 259 n. 5.

The Governor argues that before a party may invoke the jurisdiction of the federal court, the party must show that: 1) he has personally suffered some actual or threatened injury as a result of the conduct of the defendant; 2) the injury is fairly traceable to the challenged action; and 3) the injury is likely to be redressed by a favorable court decision. *Catron County B. of Comm'rs v. United States Fish and Wildlife Service*, 75 F.3d 1429, 1433 (10th Cir.1996) citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559, 112 S.Ct. 2130, 2135–36, 119 L.Ed.2d 351 (1992). It is further asserted that the mere fact that a governor is generally charged with enforcing all state laws does not make an action "fairly traceable" to the governor. *NAACP v. State of California*, 511 F.Supp. 1244, 1261 (E.D.Cal.1981). A governor may be liable for the acts of subordinates only when he actually participates or acquiesces in the alleged violation. *Parker v. Rockefeller*, 521 F.Supp. 1013, 1016 (N.D.W.Va.1981).

Plaintiffs argue that personal action by the Governor individually, is not a necessary predicate for their action against the Governor in his official capacity. *See Luckey v. Harris*, 860 F.2d 1012 (11th Cir.1988). It is

sufficient that the Governor must, "by virtue of his office, ha[ve] some connection" with the disputed conduct. *Ex parte Young,* 209 U.S. 123, 157, 28 S.Ct. 441, 453, 52 L.Ed. 714 (1908). "Whether [this connection] arises out of general law, or is specially created ..., is not material so long as it exists." *Id.*

According to the Colorado Constitution, the "supreme executive power of the state shall be vested in the governor, who shall take care that the laws be faithfully executed." Colorado Constitution, Art. IV, section 2. Moreover, the Governor is a proper party to a petition for an original writ of mandamus to compel a state official to perform lawfully his/her duties. *See People ex rel. Ammons v. Kenehan,* 55 Colo. 589, 136 P. 1033 (1913). (Plaintiffs prayer in their complaint here seeks relief in the nature of mandamus against all defendants.). Also, the Governor has final authority to order the executive directors of all state agencies to commence or cease any action on behalf of the state. *See Luckey,* 860 F.2d at 1015. Thus, based on the Colorado Constitution, I conclude that under the P–R Act and the LWCF Act, Governor Romer is a proper party subject to the Court's jurisdiction. *See Ex parte Young,* 209 U.S. at 157, 28 S.Ct. at 452–53.

Moreover, the LWCF Act designates specifically the Governor as the responsible state official for meeting the state's obligations under the Act: "[N]o plan shall be approved unless the Governor of the respective State certifies that ample opportunity for public participation in plan development and revision has been accorded...." 16 U.S.C. § 460*l*–8(d). The LWCF Act also states that "[p]ayments for all projects shall be made by the Secretary to the Governor of the State or to a State official or agency designated by the Governor or by State law having authority and responsibility to accept and to administer funds paid hereunder for approved projects. If consistent with an approved project, funds may be transferred by the State to a political subdivision or other appropriate public agency." *Id.* at 8(f)(2). As a matter of Colorado and Federal law, then, Governor Romer has, by virtue of his office, some connection with the conduct in dispute under the LWCF Act.

Also, Plaintiffs' Exhibit 49, Notes from a Colorado Board of Parks and Outdoor Recreation meeting, states, in part:

> MARTINEZ RIFLE LEASE. There was request from Dept. of Institutions to lease some facilities at Rifle. Board requested some additional services they were to provide to us. Board did not approve lease. Since then *the Governor overruled Commissioners and go* (sic) *ahead with construction of facilities....*
>
> O'MALLEY Question was over water supply, sanitary facilities and protection around maintenance.... We have agreed verbally that they would accommodate any facilities within feasible distance.... *Governor has approved building going there.*
>
> . . .
>
> BEIDLEMAN MOVE Approve lease subject to amendments.
>
> DUNCAN SECOND Carried unanimously.

Exh. 49 p. 4 (underline emphasis supplied). Exhibit 49 is evidence that the Governor of Colorado actually participated in the LWCF Act violations alleged here.

Under these circumstances, I conclude that Governor Romer is a proper party subject to this Court's jurisdiction under plaintiffs claims one and two.

### 2. *Standing*

The state defendants also move to dismiss claims one and two pursuant to Fed.R.Civ.P. 12(b)(1) arguing that plaintiffs do not have standing to bring the claims. Standing is the *sine qua non* for Article III subject matter jurisdiction.

To establish standing to bring claims one and two, plaintiffs must first "have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) 'concrete and particularized' and (b) actual or imminent, not 'conjectural' or 'hypothetical.'" *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 1723, 109 L.Ed.2d 135 (1990) (quoting *City of Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983)). Second, there must be a causal connection between the injury claimed and the conduct complained of—the injury has to

be "fairly ... trace[able] to the challenged action of defendant[s], and not ... th[e] result [of] the independent action of some third party not before the court." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (quoting *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1925–26, 48 L.Ed.2d 450 (1976)). Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." *Lujan*, 504 U.S. at 561, 112 S.Ct. at 2136–37 (quoting *Simon*, 426 U.S. at 38, 43, 96 S.Ct. at 1924, 1926–27)..

As the parties invoking federal jurisdiction, plaintiffs bear the burden of establishing these elements. *Lujan*, 504 U.S. at 561, 112 S.Ct. at 2136–37. The elements are not mere pleading requirements but rather an indispensable part of plaintiffs' case. *Id.* On a motion to dismiss, I "presum[e] that general allegations embrace those specific facts that are necessary to support the claim[s]." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 889, 110 S.Ct. 3177, 3189, 111 L.Ed.2d 695 (1990).

### a. *Injury-in-fact*

In their second amended complaint, plaintiffs allege, in pertinent part, "the use of a state wildlife area as a prison continually deprives them of affirmative rights to have the [Wildlife Area] used solely for wildlife purposes and the [State Park] used exclusively for recreation purposes." C/O ¶¶ 41. They also allege:

SWDF ... members include local residents of Rifle, Colorado [who have] sporting, educational, scientific, moral, spiritual, and recreational interests in protecting the [Wildlife Area], the [State Park], and the Rifle Gap Reservoir. In particular, SWDF's members have used and will continue to use these areas. The challenged diversion will prevent them from using public lands that were set aside in perpetuity for wildlife and recreations. The diversion will also impact wildlife that uses the area. SWDF's members have purchased Colorado hunting and fishing licenses, and will do so in the future. They also pur-

chase firearms, ammunition, archery equipment, fishing equipment and other items subject to a federal excise tax.

2nd Amended C/O ¶ 4. *See also* C/O ¶ 5 (WSERC), C/O ¶ 6 (Hamilton), C/O ¶ 7 (Saxton), and C/O ¶ 8 (Huerkamp).

I conclude that plaintiffs have alleged, with affidavits in support, an injury-in-fact which is concrete and particularized, and actual or imminent.

### b. *Injuries traceable to actions of the state defendants*

Plaintiffs allege, with affidavits in support, that their injuries are fairly traceable to the challenged actions of defendants. For example plaintiffs allege the state defendants are "causing the State of Colorado to use the Wildlife Area and the State Park for non-wildlife purposes...." C/O ¶ 40. Also, plaintiffs allege that the state defendants "are in the process of causing the State of Colorado to convert an additional 90 acres to accommodate the expansion of the prison." C/O ¶ 49 (LWCF Act claim).

### c. *Injury redressed by favorable court decision*

Plaintiffs also allege, with affidavits in support, that it is likely their injury will be redressed by a favorable court. They state "[i]f this Court grants the relief [we] request, ... [plaintiffs] will once again be able to use the entire [State Wildlife Area] and [State Park] without the harms caused by the existence of a prison." Pltf.Resp.Brief to Mtn. to Dismiss, p. 11.

Based on the pleadings and the circumstances in this case, at this motion to dismiss stage, I conclude plaintiffs have met their burden as to each element to establish standing. *Lujan v. National Wildlife Federation*, 497 U.S. at 889, 110 S.Ct. at 3189. Thus, I will deny the state defendants' motion to dismiss for lack of subject matter jurisdiction.

### B. *Fed.R.Civ.P. 12(b)(6)*

Under Rule 12(b)(6), a district court may dismiss a complaint for failure to state a claim upon which relief can be granted if it

appears beyond doubt that the plaintiffs can prove no set of facts in support of their claim which would entitle them to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). If plaintiffs have pled facts that would support a legally cognizable claim for relief, a motion to dismiss should be denied. *Id.* In reviewing the sufficiency of the complaint, all well-pled facts, as opposed to conclusory allegations, must be taken as true. *Weiszmann v. Kirkland & Ellis,* 732 F.Supp. 1540, 1543 (D.Colo. 1990). All reasonable inferences must be liberally construed in the plaintiffs' favor. *Id.*

1. *§ 1983 actions against the state defendants in their respective official capacities*

Plaintiffs' first claim in the second amended complaint alleges that the state defendants are violating the P–R Act, 16 U.S.C. § 669 et seq., by placing and planning to expand a state prison on land purchased in part with federal funds disbursed under the P–R Act. Such land is to be used solely for wildlife purposes. *See* 16 U.S.C. § 669e.

Plaintiffs allege in their second claim that the state defendants are violating the LWCF Act, 16 U.S.C. § 460*l et seq.* by placing and planning to expand a state prison on land purchased in part with federal funds disbursed under the LWCF Act which provides that such land is to be used solely for outdoor recreation purposes. *See* 16 U.S.C. §§ 460*l*–8(f)(3), 669e. Thus, plaintiffs contend that the state defendants are subject to claims for deprivation of plaintiffs' rights guaranteed under 42 U.S.C. § 1983.

Section 1983 provides a cause of action for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *Wilder v. Virginia Hospital Assoc.,* 496 U.S. 498, 507, 110 S.Ct. 2510, 2516–17, 110 L.Ed.2d 455 (1990). Section 1983 provides a cause of action for violations of federal statutes as well as the United States Constitution. *Maine v. Thiboutot,* 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980). However, there are two exceptions to this rule.

■ A plaintiff alleging a violation of a federal statute will be permitted to sue under § 1983 unless 1) "the statute [does] not create enforceable rights, privileges, or immunities within the meaning of § 1983," or 2) "Congress has foreclosed such enforcement of the statute in the enactment itself." *Wilder,* 496 U.S. at 508, 110 S.Ct. at 2517 (quoting *Wright v. City of Roanoke Redevelopment and Housing Authority,* 479 U.S. 418, 423, 107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987)).

a. *§ 1983 action under the P–R Act*

■ The state defendants seek dismissal of claim one brought pursuant to 42 U.S.C. § 1983 for violation of the Pittmann–Robertson Act, 16 U.S.C. § 669, et seq. which provides, *inter alia,:*

The Secretary of the Interior is authorized to cooperate with the States, through their respective State fish and game departments, in wildlife restoration projects as hereinafter in this chapter set forth; *but no money apportioned under this chapter to any State shall be expended therein until its legislature, or other State agency authorized by the State constitution to make laws governing the conservation of wildlife, shall have assented to the provision of this chapter and shall have passed laws for the conservation of wildlife which shall include a prohibition against the diversion of license fees paid by hunters for any other purpose than the administration of said State fish and game department....* The Secretary of the Interior and the State fish and game department of each State accepting the benefits of this chapter, shall agree upon the wildlife-restoration projects to be aided in such State under the terms of this chapter and all projects shall conform to the standards fixed by the Secretary of the Interior.

16 U.S.C. § 669 (emphasis supplied).

The threshold inquiry in determining if a statute creates a federal right enforceable under § 1983 is whether "the provision in question was intend[ed] to benefit the putative plaintiff." *Wilder,* 496 U.S. at 509, 110 S.Ct. at 2517 (quoting *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103,

106, 110 S.Ct. 444, 448–49, 107 L.Ed.2d 420 (1989)). The P–R Act contemplates the perpetuation of fish and wildlife resources "for the economic, scientific, and recreational enrichment of the people." § 669e(2).

In this case, plaintiffs include individual residents of the Rifle, Colorado area who utilize the outdoor resources at the Wildlife Area, the State Park, and the Reservoir. C/O ¶¶ 6 (Hamilton), 7 (Saxton), and 8 (Huerkamp). Also, SWDF and WSERC are non-profit groups whose members use the Wildlife Area, the State Park, and the Rifle Gap Reservoir. C/O ¶ 4 (SWDF) and C/O ¶ 5 (WSERC).

Under these circumstances, I conclude that plaintiffs fall within the P–R Act's broad statement of purpose. Thus, the Act is intended to benefit these plaintiffs.

The next question is whether the P–R Act creates a federal right enforceable under § 1983. The P–R Act requires the *quid pro quo* of laws passed by the state "for the conservation of wildlife" which must include a specific "prohibition against the diversion of license fees paid by hunters for any other purpose than the administration of [the] [s]tate's fish and game department." *Id.* This provision imposes a binding obligation on the state to pass wildlife conservation laws which must contain specific terms. Also, the P–R Act is "cast in mandatory rather than precatory terms." *Wilder,* 496 U.S. at 512, 110 S.Ct. at 2519. "The [P–R Act's] language succinctly sets forth a congressional command, which is wholly uncharacteristic of a mere suggestion or 'nudge.'" *West Virginia University Hospitals, Inc. v. Casey,* 885 F.2d 11, 20 (3rd Cir.1989) (quoting *Pennhurst State School & Hosp. v. Halderman,* 451 U.S. 1, 19, 101 S.Ct. 1531, 1540–41, 67 L.Ed.2d 694 (1981)). I conclude that the P–R Act creates a "federal right" that is enforceable under § 1983.

Having found that the P–R Act creates a federal right enforceable under § 1983, plaintiffs may sue the state defendants for alleged violations of the P–R Act unless "Congress has foreclosed such enforcement of the statute in the enactment itself." *Wilder,* 496 U.S. at 508, 110 S.Ct. at 2517 (quoting *Wright v. Roanoke Redevelopment and*

*Housing Authority,* 479 U.S. 418, 423, 107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987)).

I "'do not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy' for the deprivation of a federally secured right." *Wright,* 479 U.S. at 423–24, 107 S.Ct. at 770 (quoting *Smith v. Robinson,* 468 U.S. 992, 1012, 104 S.Ct. 3457, 3468, 82 L.Ed.2d 746 (1984)). The burden is on these state defendants to show "by express provision or other specific evidence from the statute itself that Congress intended to foreclose such private enforcement." *Wright,* 479 U.S. at 423, 107 S.Ct. at 770. If there is no express provision, private enforcement is foreclosed only when the statute itself creates a remedial scheme that is "sufficiently comprehensive ... to demonstrate congressional intent to preclude the remedy of suits under § 1983." *Wilder,* 496 U.S. at 521, 110 S.Ct. at 2523 (quoting *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n.,* 453 U.S. 1, 20, 101 S.Ct. 2615, 2626–27, 69 L.Ed.2d 435 (1981)).

The P–R Act contains no express provision precluding § 1983 suits as a remedy. It also does not contain a comprehensive enforcement scheme sufficient to demonstrate Congress' intent to foreclose reliance on § 1983. *See e.g. National Sea Clammers Ass'n.,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981) (Federal Water Pollution Control Act granted EPA considerable enforcement power through noncompliance orders, civil suits, criminal penalties, and citizen-suit provisions); *Smith v. Robinson,* 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984) (Education of Handicapped Act contained carefully tailored administrative and judicial mechanisms including local administrative review and right to judicial [review] ). The P–R Act contains no comparable provisions. Instead, the Act conditions a state's receipt of the federal funds on passage of certain laws which must include specific provisions. § 669. The P–R Act also requires that the state submit to and obtain the Secretary's approval of a comprehensive fish and wildlife resource management plan. § 669e(1). However, the statute does not require, nor does the Department of Interior provide, any mechanism by which individuals could bring

disputes under the P–R Act to the attention of the Department of the Interior or its Secretary. The P–R Act contains no provision sufficient to demonstrate an intent to foreclose relief altogether in the courts under § 1983. Thus, I conclude Congress did not foreclose an action under § 1983 for violations of the P–R Act.

b. *§ 1983 suit for violation of the LWCF Act*

 The state defendants seek dismissal of claim two for violation of 42 U.S.C. § 1983 predicated upon the LWCF Act, 16 U.S.C. § 460*l*, et seq. which provides, *inter alia,*:

**Financial assistance to States**

**(a) Authority of Secretary of the Interior; payments to carry out purposes of land and water conservation provisions**

The Secretary of the Interior (hereinafter referred to as the "Secretary") is authorized to provide financial assistance to the States from moneys available for State purposes. *Payments may be made to the States by the Secretary as hereafter provided, subject to such terms and conditions as he considers appropriate* and in the public interest to carry out the purposes of this part, for outdoor recreation: (1) planning, (2) acquisition of land, waters, or interests in land or waters, or (3) development.

. . . . .

**(d) Comprehensive State plan; necessity; adequacy; contents; correlation with other plans; ...**

A comprehensive statewide outdoor recreation plan shall be required prior to the consideration by the Secretary of financial assistance for acquisition or development projects. *The plan shall be adequate if, in the judgment of the Secretary, it encompasses and will promote the purposes of this part: Provided, That no plan shall be approved unless the Governor of the respective State certifies that ample opportunity for public participation in plan development and revision has been accorded. The Secretary shall develop, in consultation with others, criteria for public participation, which criteria shall constitute the*

*basis for the certification by the Governor. The plan shall contain—*

(1) the name of the State agency that will have authority to represent and act for the State in dealing with the Secretary for purposes of this part;

(2) an evaluation of the demand for and supply of outdoor recreation resources and facilities in the state;

(3) a program for the implementation of the plan; and

(4) *other necessary information, as may be determined by the Secretary* ....

16 U.S.C. § 460*l*–8(a) and (d) (underline emphasis supplied).

As stated at part II B(1)(a) *supra,* the initial inquiry in determining if a statute creates a federal right enforceable under § 1983 is whether "the provision in question was intend[ed] to benefit the putative plaintiff." *Wilder,* 496 U.S. at 509, 110 S.Ct. at 2517 (quoting *Golden State Transit Corp. v. Los Angeles,* 493 U.S. 103, 106, 110 S.Ct. 444, 448–49, 107 L.Ed.2d 420 (1989)).

The LWCF Act was enacted to:

assist in preserving, developing, and assuring accessibility to all citizens of the United States of America of present and future generations ... such quality and quantity of outdoor recreation resources as may be available and are necessary and desirable for individual active participation in such recreation. ...

16 U.S.C. § 460*l*–4.

Plaintiffs in this case include individual residents of the Rifle, Colorado area who utilize outdoor recreation resources, C/O ¶¶ 6 (Hamilton), 7 (Saxton), and 8 (Huerkamp) and purchase annually Colorado small game, fishing, deer, elk, bear, antelope, and turkey licenses. C/O ¶¶ 7 (Saxton), 8 (Huerkamp). Also, plaintiffs SWDF and WSERC are nonprofit groups whose members use the Wildlife Area, the State Park, and the Reservoir. They purchase firearms, ammunition, archery equipment, fishing equipment and other items subject to a federal excise tax, C/O ¶ 4 (SWDF) and C/O ¶ 5 (WSERC), or purchase Colorado hunting and fishing licenses. C/O ¶ (WSERC).

Under these circumstances, I conclude that the LWCF Act was intended to benefit these plaintiffs. I look then whether the LWCF Act creates a federal right enforceable under § 1983.

### i. *Federal obligations*

The LWCF Act establishes a system whereby a state may receive financial assistance from the Secretary of the Interior who is "authorized to provide financial assistance to the States from moneys available for State purposes. Payments may be made to the States by the Secretary as hereafter provided, subject to such terms and conditions as he considers *appropriate* and in the public interest to carry out the purposes of this part for outdoor recreation: (1) planning, (2) acquisition of land, waters, or interests in land or waters, or (3) development." 16 U.S.C. § 460*l* –8(a) (emphasis supplied).

The LWCF Act requires the State to submit a comprehensive statewide outdoor recreation plan (plan) before the Secretary will consider financial assistance under the LWCF Act. § 460*l* –8(d). The plan will be deemed "adequate" if, "in the judgment of the Secretary, it encompasses and will promote the purposes of [the LWCF Act.]" *Id.* The plan must contain:

(1) the name of the State agency that will have authority to represent and act for the State in dealing with the Secretary for purposes of this part;

(2) an evaluation of the demand for and supply of outdoor recreation resources and facilities in the State;

(3) a program for the implementation of the plan; and

(4) *other necessary information, as may be determined by the Secretary.*

16 U.S.C. § 460*l* –8(d) (emphasis supplied). Also, "[t]he plan shall take into account relevant Federal resources and programs and shall be correlated *so far as practicable* with other State, regional, and local plans." *Id.* (emphasis supplied).

### ii. *State obligations*

16 U.S.C. § 460*l* –8(d) makes its provisions mandatory upon states seeking financial assistance from the Secretary of Interior. Sec-

tion 460*l* –8(d) states that "[a] comprehensive statewide outdoor recreation plan shall be required [from the State] ... prior to the consideration by the Secretary of financial assistance for acquisition or development projects." However, unlike the P–R Act, the LWCF Act does not require from the state significant *quid pro quo* such as specific state planning and operation standards in exchange for obtaining the Secretary's financial assistance under the LWCF Act. *See Yvonne L. v. New Mexico Dept. of Human Services,* 959 F.2d 883, 888 (10th Cir.1992) (Adoption Assistance and Child Welfare Act intended to bind state to specific actions to obtain payments). Moreover, the LWCF Act provides to the State no guidance how to measure such "terms and conditions as [the Secretary] considers appropriate and in the public interest to carry out the purposes...." Section 460*l* –8(a). Also, the LWCF Act lacks definite standards for the state's plan. For example, the criteria for public participation in the development and revision of a plan is developed by the Secretary on a plan by plan basis. The LWCF Act requires the plan to contain some definite provisions such as designation of the responsible state agency but also states in vague, open ended language that the plan shall contain "other necessary information, as may be determined by the Secretary." *Id.*

Unlike the P–R Act, the LWCF Act requires submission of a plan, the required contents of which are variable and cannot be determined by the state in advance. Furthermore, the P–R Act, unlike the LWCF Act, is "cast in mandatory rather than precatory terms." *Wilder,* 496 U.S. at 512, 110 S.Ct. at 2519. *See West Virginia University Hospitals, Inc. v. Casey,* 885 F.2d 11, 20 (3rd Cir.1989) (quoting *Pennhurst,* 451 U.S. at 19, 101 S.Ct. at 1540–41).

Although the LWCF Act, contains apparently mandatory terms such as "shall" and "required," criteria such as "necessary information, as may be determined by the Secretary" and "such terms and conditions as [the Secretary] considers appropriate," *id.,* renders its provisions precatory. Under such indefinite language, I conclude that the LWCF Act does not create enforceable

rights, privileges, or immunities within the meaning of 42 U.S.C. § 1983.

Accordingly, I will deny the state defendants' Rule 12(b)(6) motion to dismiss plaintiffs' claim one based on the P–R Act. I will grant the state defendants' Rule 12(b)(6) motion to dismiss claim two based on violation of the LWCF Act.

### III.

#### Preliminary Injunction

Plaintiffs seek to enjoin prospectively the state defendants from: 1) further construction of the Rifle prison facility; 2) transferring any of the Rifle state lands out of the control of the DOP or DOW; and 3) occupying any of the newly constructed buildings pending final decision on the merits. Plaintiffs do not seek injunctive relief on a preliminary basis against the federal defendants.

After ruling on the state defendants' motion to dismiss, the only remaining claim upon which plaintiffs base their motion for preliminary injunction is claim one against the state defendants for violation of 42 U.S.C. § 1983 under the P–R Act; 16 U.S.C. § 669 *et seq.*

#### A. *History*

On September 25, 1967, the Colorado Department of Game, Fish and Parks entered into a 25-year agreement with the U.S. Bureau of Reclamation for the management for recreation purposes of the Rifle Gap Reservoir and certain federal lands and facilities associated with the Reservoir located in Garfield County, Colorado. Then on May 1, 1968, the Colorado Department of Game, Fish and Parks purchased 936.7 acres of land located in Garfield County, Colorado, together with all ditch and water rights, from Charles and Viola Clark for $112,000. This 936.7 acre parcel (the "Clark property") adjoins, and is located to the northwest of, the Reservoir property in the lower drainages of Middle and West Rifle Creeks. Half of the original purchase price for the Clark property was paid from Colorado Department of Game, Fish and Parks's Game Cash Fund. The other half of the original purchase price of the Clark property was paid from the Colorado Department of Game, Fish and Parks's Cash Fund.

On May 5, 1972, the Colorado General Assembly passed Senate Bill No. 42, effective July 1, 1972, that terminated the Colorado Game, Fish and Parks Department and created two successor state agencies, the Division of Wildlife (DOW) and the Division of Parks and Outdoor Recreation (DOP), in the Colorado Department of Natural Resources. On July 1, 1972, the DOP acceded to the Parks Cash Fund and the DOW acceded to the Game Cash Fund. At that time, the DOP also acceded to the 1967 agreement with the U.S. Bureau of Reclamation for the management of the Reservoir properties which continue to be managed for recreational purposes by the DOP.

On June 13, 1975, the DOW and the DOP entered into a cooperative agreement. That agreement granted the DOW the right to manage the western portion of the Clark property, containing approximately 490 acres, for wildlife enhancement and utilization purposes. The DOP continued to manage the remaining easterly portion.

The DOP and the DOC entered into an April 4, 1980 memorandum of understanding and agreement and lease of state property. Under this agreement, the DOP leased approximately 24 acres of the Clark property within the easterly portion to the DOC. On December 12, 1986, the DOP quit claimed all its right, title and interest in these 24 acres including some ditch and water rights to the DOC in exchange for the DOC's interest in approximately 4,000 acres of real property, including ditch and water rights, located near Pueblo, Colorado. From 1982 through 1987, the DOW, as part of a statewide comprehensive option application for federal funding, including P–R funding, applied for and received reimbursement from the federal government.

On June 13, 1991, the DOW and the DOP entered into a land exchange agreement. Under this agreement, the DOW was to take title to the DOP's interest in the Clark property in exchange for the DOW's interest in Sylvan Lake, Highline Reservoir, Brachenberry Tract, and Rifle Falls. Deeds were

never executed, delivered, or accepted under this agreement.

From 1994 to date, the DOW, as part of a statewide application for P–R funding, applied for and is receiving reimbursement for wildlife management activities on the western portion of the Clark property. There was no evidence that any application or grant for wildlife management funds was designated for the eastern portion of the Clark property where the Rifle prison is located or subject to expansion.

The Clark property, located in a deer and elk habitat, was purchased to provide winter range for deer and elk herds and hunter access to adjacent federal Bureau of Land Management property. Before it was purchased, the State of Colorado was paying annual game damage claims to the Clarks.

Deer have historically used the lower drainages of Middle and West Rifle Creeks as winter range. Elk also use the lower drainages of Middle and West Rifle Creeks as winter range. The wildlife management activities conducted by the DOW on the Clark property have improved the wildlife habitat located there.

On March 1, 1996, the DOC, the DOW, and the DOP entered into a Memorandum of Understanding (1996 MOU) which provides that the Clark property is to be partitioned between the DOW and the DOP as their interests warrant, accounting for expenditures made on the property by the individual divisions since the property's acquisition in 1968. The partition is to be roughly along the lines outlined by the management responsibilities set forth in the 1975 cooperative agreement between the DOW and the DOP with the DOW taking fee title to the western portion and the DOP taking fee title to the eastern portion where the prison facility is located.

The 1996 MOU calls for the DOP to quit claim to DOC an undivided one half interest in the 24 acres occupied by the prison facility that it is to receive from the DOW via the partition, together with certain water rights. From the evidence, it is impossible to chart a chain of title for the Clark property from the Clarks forward to date. Also, the DOC is granted an option to purchase up to an additional 90 acres for additional value from the DOP after completion of the partition. Given the nature of its proposed use, it is likely the public would be excluded from these additional 90 acres of land.

The Office of the Inspector General of the U.S. Department of Interior is conducting an audit of the use of license fees and federal P–R monies by the DOW. This audit includes expenditures made with respect to the Clark property and the effect of the 1996 MOU. The auditors have their work cut out for them. The evidence before me is wholly inadequate to trace or account for these funds.

Plaintiffs contend the state defendants have violated the P–R Act by 1) using land acquired, at least in part, with P–R funds for other than wildlife purposes, and 2) diverting P–R development and maintenance funds for land dedicated to wildlife purposes to an unauthorized use.

### B. *Preliminary injunction law*

■ The purpose of a preliminary injunction under Fed.R.Civ.P. 65 is to preserve the status quo between the parties pending a final determination on the merits. *University of Texas v. Camenisch,* 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981); *Lundgrin v. Claytor,* 619 F.2d 61, 63 (10th Cir.1980). If a preliminary injunction issues, it serves to preserve the power to render a meaningful decision on the merits. *Tri–State Generation & Transmission Ass'n v. Shoshone River Power, Inc.* 805 F.2d 351, 355 (10th Cir. 1986). Preliminary injunction is an extraordinary remedy—an exception rather than the rule. *GTE Corp. v. Williams,* 731 F.2d 676, 678 (10th Cir.1984). Thus, the right to relief must be clear and unequivocal. *See Penn v. San Juan Hosp.,* 528 F.2d 1181, 1185 (10th Cir.1975). *See generally* 11 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948m at 428–29 nn. 19–21 (1973 & 1991 Supp.).

A preliminary injunction is an equitable remedy that invokes the sound discretion of the district court. *Lundgrin,* 619 F.2d at 63. The burden is on the movant to make a *prima facie* showing of a probable right to

the ultimate relief and a probable danger of injury if the motion is denied. *Id.* A preliminary injunction may issue if the movant shows clearly: (1) irreparable injury if the injunction is not granted; (2) the threatened injury outweighs any harm the preliminary injunction will cause the opposing party; (3) the preliminary injunction is not adverse to the public interest; and (4) a substantial likelihood of success on the merits. *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir.1991); *Lundgrin*, 619 F.2d at 63.

The 10th Circuit has adopted a modified "likelihood of success" requirement. If the movant has satisfied the first three preliminary injunction requirements, the movant may establish likelihood of success by showing questions "so serious, substantial, difficult and doubtful, as to make the issues ripe for litigation and deserving of more deliberate investigation." *Walmer v. United States Dept. of Defense*, 52 F.3d 851, 854 (10th Cir.1995); *City of Chanute v. Kansas Gas and Elec. Co.*, 754 F.2d 310, 314 (10th Cir. 1985). As will become evident, the modified likelihood of success rule does not apply.

■ The following types of preliminary injunctions are disfavored:

1) a preliminary injunction that disturbs the status quo;

2) a preliminary injunction that is mandatory as opposed to prohibitory; and

3) a preliminary injunction that affords the movant substantially all the relief he may recover at the conclusion of a full trial on the merits.

*Visa USA, Inc.*, 936 F.2d at 1098. A movant seeking a preliminary injunction which falls into one or more of these three categories must satisfy an even heavier burden of showing that "on balance, the four factors weigh heavily and compellingly [in movant's favor]" before such an injunction may be issued. *Id.* at 1098–99. Here, the preliminary injunction sought does not fall into any of these categories. Thus, the heightened burden does not apply.

### C. Preliminary injunction factors

#### 1. Irreparable injury if preliminary injunction is not granted

Plaintiffs argue that once the existing temporary facilities are expanded they will be irreparably harmed because the land "will never again be a publicly (sic)-accessible wildlife area ... the entire valley surrounding the Rifle Gap Reservoir will be altered, ... plaintiffs will be unable to use the wildlife area for recreation, ... [and] the area's elk and deer herds will be excluded from their winter range." Pltfs.' Brief p. 10–11.

#### a. West Rifle Creek State Wildlife Area as an irreplaceable and unique state park.

■ State wildlife areas are unique. *See Sierra Club v. Davies*, 955 F.2d 1188, 1190, fn. 3 (8th Cir.1992). This concept is not novel to state wildlife areas. Under well established real property principles, any given piece of property is considered unique. *See e.g. United Church of the Medical Center v. Medical Center Comm'n*, 689 F.2d 693, 701 (7th Cir.1982). Indeed, in the context of a preliminary injunction request, loss of real property is *per se* irreparable injury. *Id.; Bean v. Independent American Sav. Ass'n*, 838 F.2d 739, 743 (5th Cir.1988) (injunctive relief appropriate where movant stands to lose interests in real property which is presumed to be unique).

This argument alone is enough to establish irreparable harm because if "ordinary property" is unique so that any injury is presumed to be *per se* irreparable, then, *a fortiori*, state wildlife lands are unique.

#### b. Environmental harm is presumed to be irreparable

Plaintiffs' proffer two bases for finding irreparable harm in this case from 1) physical harm to the land by construction of the expanded prison including destruction of meadows near the prison and construction of another sewage pond to accommodate the increase in the prison population, and 2) negative effects on the elk and deer herds which winter in the area.

■ Plaintiffs state that "[e]nvironmental harm is presumed to be irreparable." Pltfs. Brief p. 16, citing, *inter alia, Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 545, 107 S.Ct. 1396, 1404, 94 L.Ed.2d 542 (1987). However, defendants argue, and I agree, that there is no such presumption. *Amoco* states that "[a]n environmental injury ... [is] generally considered irreparable." However, *Amoco* rejected the "irreparable harm" presumption stating that such a presumption "is contrary to traditional equitable principles...." *Amoco,* at 544–45, 107 S.Ct. at 1404 citing *People of Village of Gambell v. Hodel,* 774 F.2d 1414, 1423 (9th Cir.1985). The *Amoco* court agreed that "[e]nvironmental injury, by its nature ... is often ... irreparable." *Amoco,* at 545, 107 S.Ct. at 1404. However, this does not translate to a *per se* presumption of irreparable harm.

■ The pertinent inquiry is whether the environment will be harmed by the expansion of the Rifle prison facility. State defendants ignore this argument except to note that the 24 acres where the new construction is taking place has been occupied by the prison facility for many years. They conclude that since the new construction is taking place on the 24 acres, no further degradation or harm to the environment will occur beyond what has occurred over the last 10 years. This argument, however, ignores the impact of adding 90 acres to support an expanded prison.

During the preliminary injunction hearing, several witnesses testified about the environmental impact of the prison expansion. Steven Hinchman, director of WSERC, testified that the Wildlife Area is located in a valley near the Reservoir. The valley contains West Rifle Creek, Middle Rifle Creek, and East Rifle Creek all of which fill the Rifle Gap Reservoir. The area is bounded on the west and the south by the Grand Hogback, a geological formation of 1,000 ft. high knife-like ridges, which forms a natural barrier to wildlife migration. The Rifle prison is located on the east side of Middle Rifle Creek. Hinchman testimony; Exh. 102.

Area deer and elk herds summer in the Flat Tops wilderness and United States Forest Service lands to the north of the Wildlife Area. The Grand Hogback prevents the herds from migrating due west during the winter. However, the three creek valleys provide a passage for the herds to come to lower ground for the winter. Before the Reservoir began to fill in 1967, the herds would gather in what is now the Wildlife Area. During the mid 1960's, the DOW was paying the Clark family, owners of the land, between $16,000 and $20,000 per year in game damage. In 1967, the State of Colorado bought the 936 acre parcel together with all ditch and water rights from the Clarks for $112,000. The parcel adjoins, and is located to the northwest of, the federal reservoir property in the lower drainages of Middle and West Rifle Creeks.

Donald Crane (Crane), DOW district wildlife manager for the North Rifle District, including the Clark property, testified that the eastern portion of the Clark property contains the Rifle prison facility, the surrounding meadows, and the 90 acres upon which DOC plans to utilize to support the proposed prison expansion. Crane also testified that the land upon which DOC plans to expand includes critical deer and elk habitat. The meadows located around the present Rifle prison facility serve as critical winter range and habitat for the deer and elk herds. Crane defined "critical habitat" as habitat that if not available to the local population of animals will lead to their demise. He defined "critical winter range" as the area where an animal remains during the winter because there is nowhere else for the animal to go. Crane testimony; Exh. 4 p. 2. He also testified that the fields used by the herds are irrigated by the Heinze and Mullin ditches. One field is directly south of the prison facility and the other fields are on the east side of Middle Rifle Creek.

Pursuant to the June, 1991 land exchange agreement, the DOW began managing the area where the prison is situated. Since then, the DOW has rehabilitated the meadows, removed some fences, reconstructed other fences, and rebuilt ditches. Crane testimony. In a DOW memorandum dated January 9, 1995, Crane wrote "[a]ny loss of lands along with the associated water rights would jeopardize the management of the remaining

meadows...." Exh. 4, p 1. Crane testified that the meadows are planted with "lure crops" such as alfalfa and sainfoin. "Lure crops" are planted: 1) to reduce or eliminate game damage by luring big game animals away from private lands; 2) on and around winter ranges to keep the herds on the winter range; and 3) to provide highly nutritious forage in the early spring "green up" of the crops so the animals can start to rebuild their body fat storage as they start to move back up the mountain to their summer range. Torbit testimony.

Crane also testified that construction activity during the winter and spring would have a negative impact on the deer and elk. He stated that the animals would move off the meadows and go elsewhere for the winter. This would result in game damage claims against the state and dispersal hunts in which some animals were "harvested" to encourage the remaining animals to avoid these areas in hopes of alleviating the damage problem. Crane testimony.

The DOW uses water from the Heinze and Mullin ditches to irrigate the meadows. Crane testimony. The 1996 MOU calls for a transfer of Heinze ditch water rights to DOC. Without the water, some parts of the meadows may dry up since none of the meadows are subirrigated. Crane testimony.

Plaintiffs also presented the testimony of Steve Torbit (Torbit), senior scientist with the National Wildlife Federation. Torbit testified that "winter ranges" are the lower areas to which big game animals migrate for the winter. The winter range provides forage for the animals to consume during the winter and provides some protection from deeper snows and colder temperatures found in the higher range areas the animals use during the rest of the year. Torbit also testified that winter range is the limiting factor in big game populations in the west. Winter ranges which are maintained and sustained are central to the long term health and productivity of the herds. Torbit could not estimate the herd populations in the area.

The state defendants' witness John Ellenberger (Ellenberger) testified that the winter herd size around the Rifle prison is approximately 155 elk and 90 deer. In the spring, another approximately 150 deer move in to the area to graze. He estimated the Colorado elk population to be 190,000. There are substantially more deer than elk.

Ellenberger testified that lure crop fields are planted near the prison. This includes an alfalfa field directly south of the prison, more alfalfa plantings upstream on West Rifle Creek as well as sainfoin fields in the area. He also said that there are no other fields in the lower drainages of West and Middle Rifle Creek that are maintained by the DOW for lure crops. Ellenberger stated that he understood the plans for the prison expansion to include building an additional sewage treatment lagoon, a proposal to build an exercise field, and building new dormitories. Ellenberger opined that the proposed construction would have a minimal or negligible impact on the deer and elk herds located in the area. However, he testified that his opinion did not account for reduction in water that might be available for irrigating the lure crop fields. On cross-examination, Ellenberger stated he could not disagree with Crane's statement that "[a]ll of the meadows are critical to the management of the [Wildlife Area]." He then stated that "there will be some impacts if we do lose land."

Ellenberger's opinion that the effect of the planned prison expansion on the elk and deer herds would be minimal or negligible was formed without consideration of reduction in water available for irrigation. Also, although Ellenberger disagreed with Crane as to the degree of harm to the herds, he agreed that the elk and deer herds would be harmed to some extent. Nevertheless, the evidence also showed herd ability to adapt to prison existence and activity. For example, photographs show an elk herd comfortably resting near the present facility.

The state defendants do not contest plaintiffs' evidence that the expanded Rifle prison will have lighting, Huerkamp aff. ¶ 8, increased traffic, id. at ¶ 9, motion sensor alarms, id. at ¶ 10, and outdoor speakers, all of which affect the surrounding wildlife land.

I find and conclude that:

1. the meadows planted with "lure crops" will be affected negatively by a decrease in irrigation;

2. the March 1, 1996 MOU calls for DOC to acquire the Heinze and the Mullin ditch rights for use in building a fifth sewage lagoon to support the increase in prisoners and staff; and

3. the deer and elk herds will be affected negatively by the construction activity and loss of the meadows as winter range.

I conclude that plaintiffs have shown clearly that irreparable injury to the environment by the prison expansion on the additional 90 acres will occur if the preliminary injunction does not issue.

### 2. *Balance of harms*

Next, plaintiffs must establish clearly that the harm they will suffer if the prison is expanded outweighs the harm defendants may suffer due to a delay in construction of the prison. Plaintiffs fail to meet their burden.

I recognize the state's "strong and important interest in proceeding with construction [because] [it] must provide constitutionally sufficient housing and services for prison inmates, including adequate space and facilities." *Ramos v. Lamm*, 639 F.2d 559 (10th Cir.1980). This interest must be weighed against the environmental harm caused by the prison expansion.

It is uncontested that the Rifle prison expansion will house only 42 more prisoners than it does presently. The small increase in the number of prisoners to be housed at the new prison cuts two ways. First, it shows a lesser degree of state need. At the same time, though, it reflects a lesser degree of environmental impact. If an environmental injury is likely, the balancing of harms usually favors issuing a preliminary injunction. *Village of Gambell*, 480 U.S. at 545, 107 S.Ct. at 1404. But here, the herds are not large in relation to the Colorado population and the extent of harm to them is open to question. I conclude that plaintiffs do not prevail on the second prong of entitlement to preliminary injunction because the balance remains in equipoise.

### 3. *Injunction not adverse to the public interest*

Plaintiffs argue that enjoining further construction on the new prison until the state defendants have fully complied with federal and state laws will not harm the public and in fact, "is in the best interest of the public." Pltfs.Brief p. 20. They state that "[t]he public will no longer be able to use the Wildlife Area for the purposes it was intended if the prison is completed." Plaintiffs also argue that asking defendants to comply with the law imposes no harm on them but rather is merely asking them to do that which they are required to do in any event. The state defendants merely refer the court to their arguments under prongs 1 and 2.

Plaintiffs' argument that they will no longer be able to use the Wildlife Area is overbroad and not based on evidence before me. At this point, the 24 acres upon which the present Rifle prison is located has not been available for public use for many years. If the injunction does not issue, an additional 90 acres may be unavailable to the public. However, there is no evidence before me that the remainder of the Wildlife Area and the Park will not be available for the use, benefit, and enjoyment of the public.

If I issue a preliminary injunction, the state defendants will suffer the harms associated with a delay in the prison expansion construction. The state defendants presented the testimony of Jack Laughlin (Laughlin), director of facility management services for the DOC. Laughlin testified about a work stoppage at the Rifle prison. In May, 1996, as a result of a temporary restraining order unrelated to this case, construction halted at the Rifle prison for approximately 20 days. As a result, the general contractor filed a claim for $34,000 in damages or approximately $1,700 per day. Laughlin testified that work stoppage damages would now be $2,000 per day. Also, the DOC would be subject to potential claims from other contractors and subcontractors relative to lost opportunities to bid or do other work. Laughlin testimony. And, importantly, prison beds are chronically and critically in short supply.

The harm to the state defendants is mitigated, however, by their decision to continue with the prison expansion even after this suit was file. By proceeding, the state defendants assumed any monetary risk resulting from their decision. *See e.g. Puerto Rico Conservation Foundation v. Larson,* 797 F.Supp. 1066, 1072 (D.P.R.1992).

It is plaintiffs' burden to show clearly each of the four preliminary injunction requirements. Here, the evidence of whether an injunction is not adverse to the public interest is in equipoise, at best. Thus, I conclude that plaintiffs have failed to meet their burden on the third prong.

### 4. *Substantial likelihood of success on merits of claim one*

██ To show a substantial likelihood that plaintiffs will prevail on claim one, they must show clearly that the state defendants are violating the P–R Act. Plaintiffs contend the state defendants are violating the P–R Act by using for improper purposes land purchased or developed and maintained with P–R funds. Specifically, plaintiffs assert that the land in question was bought or developed and maintained with funds under the P–R Act which requires that such land be used for wildlife purposes.

Plaintiffs claim the state defendants have violated 42 U.S.C. § 1983 by depriving them of benefits to which they are entitled under the P–R Act. I held that there is § 1983 action available to plaintiffs based on the P–R Act. *Supra* at part II B(1)(a). The threshold question is whether plaintiffs have shown that the state defendants violated the provisions of the P–R Act. Plaintiffs must first show that the land in question is subject to the P–R Act. This may be shown by evidence that P–R funds were use to acquire the land or that the property was maintained with P–R funds. Plaintiffs must then show that the state defendants used the land for other than wildlife purposes or for a use not in accord with the approved comprehensive wildlife plan or project.

The P–R Act states, in part:

[t]he Secretary of the Interior is authorized to cooperate with the States, through their respective State fish and game departments, in wildlife-restoration projects ...; but no money apportioned under this chapter to any State shall be expended ... until [the State] shall have assented to the provision (sic) of this chapter and shall have passed laws ... which shall include a prohibition against the diversion of license fees paid by hunters for any other purpose that the administration of said State fish and game department.... The Secretary of the Interior and the State fish and game department of each State accepting the benefits of this chapter, shall agree upon the wildlife-restoration projects to be aided in such State under the terms of this chapter....

16 U.S.C. § 669

The term "wildlife-restoration project" is construed to mean and include:

the selection, restoration, rehabilitation, and improvement of areas of land or water adaptable as feeding, resting, or breeding places for wildlife, *including acquisition by purchase ... [or by] lease ... and the construction thereon or therein of such works as may be necessary to make them available for such purposes.*

16 U.S.C. § 669a (emphasis supplied).

The Act also provides that:

[t]he Secretary shall approve only such comprehensive plans or projects as may be substantial in character and design and the *expenditure of funds hereby authorized shall be applied only to such approved comprehensive wildlife plans or projects....*

16 U.S.C. § 669e(2) (emphasis supplied).

The P–R Act authorizes the Secretary of the Interior to make rules and regulations for carrying out its provisions. 16 U.S.C. § 669i. Pursuant to § 669i, the Secretary promulgated regulations outlining requirements of the P–R Act. *See generally* 50 C.F.R. part 80. The regulations require, in pertinent part, that the "real property acquired or constructed with Federal Aid funds must continue to serve the purpose for which acquired or constructed." 50 C.F.R. § 80.14.

#### a. *Acquisition of Clark property*

Plaintiffs contend the State of Colorado received P–R Act funds which it used to purchase the Clark property upon which the Rifle prison is located and the planned expansion would occur. The state defendants contend there is no evidence of receipt of P–R funds used to acquire the Clark property.

It is undisputed that the state defendants seek to expand the Rifle prison onto land which was formerly part of the 936.7 acre parcel of land owned by Charles and Viola Clark. In 1968, the Colorado Department of Game, Fish and Parks paid the Clarks $112,-000 for their property. Plaintiffs allege that part of the $112,000 was reimbursed to the state by the federal government with P–R funds.

Jerry L. Wolfe (Wolfe), retired from the state DOW, testified that he spent 5 years as a wildlife biologist in Grand Junction during which time he was responsible for federal aid budgeting for the area known as the Clark property. Wolfe stated his immediate supervisor, Claude White, told him that the Clark property was purchased with federal aid money. However, on cross-examination Wolfe testified that he never saw any documentation that the Clark property was purchased with federal aid money. More importantly, the "federal aid money" was not specifically identified as P–R funds.

Wolfe also testified about the July, 1981 Master Management Plan for West Rifle Creek State Wildlife Area (Plan). Exhibit 11. The Plan contains the following statement. "The [state wildlife area] consists of 490 acres managed under a cooperative agreement with the Division of Parks and Outdoor Recreation. The area originally consisted of 935 acres purchased with Federal Aid Funds in 1968. (However, in 1975 the state legislation (sic) transferred management and control of these lands to the Division of Parks and Outdoor Recreation thereby necessitating the cooperative agreement.)" Exh. 11, numbered page 1, ¶ 2. Wolfe testified that this statement matched his understanding of the acquisition of the Clark property. He also stated that the document was prepared by Nancy Shock, a temporary employee working for him at the time.

On cross-examination, Wolfe admitted that he did not know the basis of Ms. Shock's statement that the 935 acres were purchased with federal aid funds in 1968. *Id.* He also conceded he had no knowledge whether Ms. Shock searched federal funding records when she produced the Plan. *Id.*

Mary L. Gessner testified that she is the assistant regional director for federal aid for the United States Division of Fish and Wildlife Services in region 6 which includes the State of Colorado. Exh. C–1 ¶ 1. As part of her job duties, she is responsible for administering the P–R Act, including keeping records of all federal aid grants issued under the Act. *Id.*

Gessner explained that when land is purchased with P–R money, their records contain grant documentation in the form of an application for federal assistance, copies of real estate appraisals, and title vesting certificates. No such records were found concerning the Clark property. Also, the records include a separate land record card for each land transaction. Gessner reviewed the land record card for Garfield County, Colorado and found no indication that any real estate had been purchased with P–R monies in the Wildlife Area or the State Park. Exh. C8. Gessner also reviewed the Garfield County map maintained in her office which reflects land purchased with P–R funds. The map showed no P–R property anywhere near the Clark property. I find credible her testimony that grant applications, maps (Exh. C9), and land record cards (Exh. C9) she reviewed contained no evidence that P–R funds were used by the State of Colorado to acquire any property in the area known as the West Rifle Creek State Wildlife Area. *Id.* at ¶¶ 2, 3.

Plaintiffs introduced no direct evidence that the State of Colorado received P–R funds used to acquire the Clark property. Plaintiffs' circumstantial evidence that the Clark property was acquired with P–R monies is weak and unpersuasive. I conclude that plaintiffs have not met their burden to show clearly that P–R funds were used by

the State of Colorado to acquire the property in question.

b. *Operations and Development of Clark Property*

Plaintiffs may also establish a P–R violation by showing that P–R monies were used to develop and maintain land subject to the P–R Act which is being used for a purpose other than for wildlife. Again, plaintiffs' evidence falls short.

During the hearing, the state defendants stipulated that P–R funds were used for maintenance and development of the Wildlife Area within the western 490 acres of the Clark property. The parties stipulated that federal funds were spent on the Wildlife Area from 1974 through 1987 and from 1994 to date. *See* Exhs. 26–29. However, the Rifle prison facility is located on the eastern portion of the Clark property. Thus, the question is whether P–R monies were used to maintain or develop the eastern portion of the Clark property.

Robert Towry, the habitat section supervisor for the DOW, testified that he is responsible for activities related to the Rifle prison including maintaining the federal funding records and property records. His records include the records of the former Colorado Department of Game, Parks, and Recreation. These records include information of any federal funding used to acquire or operate and maintain the Rifle prison property.

Towry testified that he found no record of federal aid involvement in the purchase of the Clark property, including reimbursement under P–R to the State of Colorado for the purchase. Consistent with the parties' stipulation, Towry also testified that DOW used P–R funds for development and maintenance activities for the Wildlife Area. However, Towry did not testify that P–R funds were used for development and maintenance activities on the eastern portion of the Clark property where the Rifle prison is located.

Donald Crane, an employee of DOW, testified that he planted sainfoin in one of the fields located around the Rifle prison and also cleaned the Heinze and Mullin ditches. He testified that it was his impression that some of the equipment he used to do this maintenance was purchased with federal aid, although he also stated he had no direct knowledge of this.

■ In the alternative, plaintiffs argue that the eastern portion of the Clark property became subject to the P–R Act pursuant to the Division of Wildlife and Division of Parks and Outdoor Recreation Exchange Agreement (Exchange Agreement) dated June 13, 1991. Exh. 2. The Exchange Agreement provided that DOW would receive title to the eastern portion of the Clark property and, in exchange, DOP would receive title to four parcels described as 1) Sylvan Lake, Eagle County, Colorado, 2) Highline Reservoir, Mesa County Colorado, 3) Brachenberry Tract, Larimer County, Colorado, and 4) Rifle Falls, Garfield County, Colorado. It is undisputed that some, if not all of the four parcels were purchased with P–R monies.

■ The law of the state in which land is located governs the transfer of lands. *Northwestern Mutual Life Ins. Co. v. Overholt,* 18 F.Cas. 403, 4 Dill C.C. 287 (1878). In Colorado, although livery of seisin is unnecessary to pass title to real property, § 38–30–103, C.R.S., conveyance must be by good and sufficient deed, § 38–30–101, C.R.S., delivered to and accepted by the grantee. *Rittmaster v. Brisbane,* 35 P. 736, 19 Colo. 371 (Colo.1894); *Tuttle v. Burrows,* 852 P.2d 1314 (Colo.App.1992).

Here, plaintiffs presented no evidence that deeds to the parcels of land covered by the Exchange Agreement were executed, delivered or accepted by the grantees. I have no basis to find that ownership of the eastern portion of the Clark property was ever transferred to the DOW. Thus, plaintiffs have failed to show that the eastern portion of the Clark property was subject to the P–R Act.

Plaintiffs have not met their burden to show clearly a substantial likelihood of success on the merits of claim one.

Accordingly, IT IS ORDERED that:

1. the state defendants' motion to dismiss claim one (§ 1983 under the P–R Act) and claim two (§ 1983 under the LWCF Act) for

lack of subject matter jurisdiction and lack of standing is DENIED;

2. the state defendants' motion to dismiss claim one for failure to state a claim upon which relief can be granted is DENIED as to claim one (P–R Act) and GRANTED as to claim two (LWCF Act); and

3. plaintiffs' motion for a preliminary injunction is DENIED.